CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

09/26/2018

JULIA C. DUDLEY, CLERK
BY: H. Wheeler
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | | |
|---|---|---|
| LEROY A., | ) | |
|     Plaintiff, | ) | Civil Action No. 3:17-cv-00030 |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | |
| SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | By:    Joel C. Hoppe |
|     Defendant. | ) |     United States Magistrate Judge |
| | ) | |

Plaintiff Leroy A., appearing pro se, asks this Court to review the Acting Commissioner of Social Security's ("Commissioner") final decision denying his application for a closed period of disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434. The case is before me by the parties' consent under 28 U.S.C. § 636(c). ECF No. 12. Having considered the administrative record, the parties' briefs and oral arguments, and the applicable law, I find that the Commissioner's final decision is supported by substantial evidence and must be affirmed.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*,

1

88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20 C.F.R. § 404.1505(a). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can

perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Leroy A. filed this DIB application in August 2013, alleging disability from a stab wound, subsequent shoulder surgery, and anxiety. Administrative Record ("R.") 94–95, ECF No. 10-1. He ultimately sought disability benefits for a closed period from May 25, 2013, through October 21, 2014, because he started working as a taxi driver on October 22, 2014. R. 46–48. Disability Determination Services ("DDS"), the state agency, denied Leroy A.'s claim initially in March 2014, R. 93, and on reconsideration in September of the same year, R. 109. On February 24, 2016, Leroy A. appeared with counsel and testified at an administrative hearing before ALJ Theodore Annos. R. 44–62. A vocational expert ("VE") also testified at this hearing. R. 63–68.

ALJ Annos issued an unfavorable decision on March 25, 2016. R. 18–36. He first found that Leroy A. had not engaged in substantial gainful activity during the closed period, but that he did work as a food delivery driver "for a couple of weeks in July 2014" before he had to quit because of car problems. R. 20 (citing R. 53). At steps two and three, ALJ Annos found that Leroy A.'s "bilateral shoulder disorders, hip degenerative joint disease (DJD), degenerative disc disease (DDD) and DJD of the thoracolumbar spine, affective disorder, and anxiety disorder" were severe medical impairments, but that they did not meet or medically equal any of the Listings during the closed period. R. 21–23. Some of these impairments stemmed from injuries Leroy A. sustained when his son, who was suffering an acute episode of borderline psychosis, attacked and stabbed his father on March 20, 2013. *See* R. 24–25.

ALJ Annos next evaluated Leroy A.'s residual functional capacity ("RFC") based on all of his medical impairments during the closed period. *See* R. 24–34. He found that Leroy A. could have performed "light work" that involved occasionally reaching overhead and pushing/pulling with either upper extremity, but frequently reaching in all other directions; occasionally climbing ramps/stairs, balancing, stooping, kneeling, crouching, and working around common workplace hazards; and never crawling or climbing ladders, ropes, or scaffolds.[1] R. 24. He was also limited to "simple, routine, and repetitive tasks; simple work-related decisions; occasional interaction with the public and coworkers; and work in an environment free of fast-paced production requirements." *Id.* (punctuation corrected). This RFC ruled out Leroy A.'s return to his past work as an insurance agent and furniture delivery driver. R. 34. Finally, based on this RFC finding and the VE's testimony, ALJ Annos concluded that Leroy A. was not disabled between May 25, 2013, and October 21, 2014, because he still could have performed certain widely available "light, unskilled" occupations, such as clerk, ticketer, or sorter. R. 35 (citing R. 65–66). The Appeals Council denied Leroy A.'s request for review, R. 1–3, and this appeal followed.

Leroy A., now representing himself, filed a brief concisely explaining his position why the Commissioner's final decision is not supported by substantial evidence or why the decision otherwise should be reversed or the case remanded. Pl.'s Br., ECF No. 15; *see* W.D. Va. Gen. R. 4(c). The brief reads in relevant part:

---

[1] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). A person who can meet these modest lifting requirements can perform light work only if he or she can also "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1990); *see also* 20 C.F.R. § 404.1567(b). "'Frequent[ly]' means occurring from one-third to two-thirds of the time," SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983), whereas "'[o]ccassionally' means occurring from very little up to one-third of the time," SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996). Doing something on an "occasional" basis would typically total "no more than about 2 hours of an 8-hour workday." SSR 96-9p, 1996 WL 374185, at *3.

> The incident occurred on March 20, 2013. The doctors stated my son experienced a borderline acute psychosis, which led my son to attack me. I suffered a collapsed lung from a stab wound and a completely torn rotator cuff. As a result, I've had an unsuccessful rotator cuff surgery which gives me ongoing pain and discomfort. As a result of the physical wounds I suffered on March 20, 2013, I experience psychological, physical, and emotional trauma which requires ongoing medical treatment. My medical treatment at that time led to my inability to seek employment from March 20, 2013, to November 2014.

Pl.'s Br. 1 (punctuation corrected).[2] This position mirrors Leroy A.'s prior descriptions of his allegedly disabling medical conditions during the relevant time. At the administrative hearing in February 2016, for example, he testified that he could not work at all between May 25, 2013, and October 21, 2014, because he was recovering from a failed rotator-cuff surgery on his left shoulder, R. 57–59, and suffering from anxiety that frequently caused nightmares and episodes where he would "just break down and cry," R. 60–61. In October 2013, Leroy A. reported that shoulder pain severely restricted his abilities to reach overhead, use his hands to grip or grasp objects, and lift or carry more than about five pounds, and that he had trouble staying on task and interacting with people. *See* R. 257–63.

Leroy A.'s position on appeal is reasonably construed as a challenge to ALJ Annos's RFC determination and in particular his finding that Leroy A.'s statements describing disabling shoulder pain and anxiety were "not entirely credible." R. 29–31; *see Mascio v. Colvin*, 780 F.3d 632, 638–40 (4th Cir. 2015) (explaining the role that a claimant's subjective symptoms, such as pain or fatigue, plays in a proper RFC determination).

### III. Background

On March 21, 2013, Leroy A. went to the emergency department at the University of Virginia suffering from a knife wound to the left chest and increased pain in the left shoulder.

---

[2] Leroy A. also filed several additional medical records documenting treatment he received for knee pain in 2017 and 2018. ECF No. 18. At oral argument, Leroy A. confirmed, and the Court agreed, that these records are immaterial to the Commissioner's final decision denying his DIB application for the closed period between May 2013 and October 2014. *See* 42 U.S.C. § 405(g) (sentence six).

*See* R. 302–07, 350. He explained that he had just been stabbed by his son, who had been acting erratically and "not quite right" the night before. R. 307; *see* R. 313. Leroy A. was admitted to the trauma unit following placement of a chest tube and discharged home on the morning of March 23, 2013. R. 309–13. A physical examination showed a two-centimeter stab wound around the sixth and seventh rib space without signs of infection, full strength in all four extremities, and no joint pain with motion of the upper extremities, R. 308, but "limited" motion in the left shoulder due to an underlying rotator cuff injury, R. 313. *See* R. 377–80, 392. X-rays of his left shoulder showed "high riding shoulder . . . suggestive of progressive rotator cuff injury." R. 312. On mental status examination, Leroy A. was "dismayed about the issues with his son and appear[ed] appropriately concerned about his son's wellbeing." R. 313 (punctuation corrected).

Leroy A. continued to suffer pain and decreased motion in his left shoulder after the March 20 incident, *see, e.g.*, R. 57–59, 344, 350, 365, 375, 394, but did not seek any specialized care until fairly late in the spring of 2013, *see* R. 344, 368, 372–73. An MRI taken on May 8 showed "near to full width tears of the supraspinatus and infraspinatus tendons with retraction to the superior glenoid," "[t]endinopathy and partial thickness tearing of the superior fibers of the subscapularis tendon with medialization of the biceps tendon," "[m]oderate AC joint arthropathy," and "[d]egenerative tearing of the superior labrum." R. 367. Mark Miller, M.D., prescribed Percocet for pain, referred Leroy A. to physical therapy, and recommended left shoulder arthroscopic rotator repair, biceps tendonesis, and subacrominal decompression. *Id.* Leroy A. chose to have surgery, *id.*, even though Dr. Miller cautioned that "repair may not be possible" given the "chronicity of the injury and the significant retraction of the tendon," R. 345.

6

Dr. Miller attempted this outpatient procedure on June 24, 2013. R. 344–46. After debriding the tendon for almost an hour, however, he "decided that a rotator cuff repair [was] both inadvisable and impossible" given the "massive nature" of the tearing and minimal residual tissue. R. 345. Leroy A. was discharged home with an arm sling and pain medication. R. 346–47. On July 5, Dr. Miller removed Leroy A.'s sutures, addressed pain-control measures, prescribed physical therapy, and reiterated instructions for wearing the sling. R. 343. He also referred Leroy A. to Stephen Brockmeier, M.D., to inquire "about possible shoulder tendon transfer surgery," *id.*, but Leroy A. reportedly "opted to hold off on that" recommendation, R. 339. On August 6, 2013, Dr. Miller cleared Leroy A. to stop wearing the sling and instructed him to follow up as needed with Dr. Brockmeier. R. 339.

Leroy A. established care with Dr. Brockmeier three days later. R. 335–38 (Aug. 9, 2013). A physical examination of the left upper extremity showed decreased strength, positive impingement, restricted external rotation, and "pseudoparalysis" on flexion and abduction. R. 337. X-rays taken the same day showed "mild" degenerative changes in the acromioclavicular joint, no evidence of acute fracture or dislocation, and a "high riding shoulder which [was] grossly unchanged from prior [imaging] and could be due to chronic rotator cuff injury or projection." R. 392. Dr. Brockmeier noted that Leroy A. had "an inoperable rotator cuff tear and [was] struggling with pain and function." R. 337. They discussed at length the various treatment options, specifically reverse total shoulder replacement ("reverse TSA") versus latissiumus treatment versus "conservative treatment." *Id.* Dr. Brockmeier thought that Leroy A. was too young for the reverse TSA, but that he was a "good candidate for the latissimus transfer" and recommended moving forward with that surgery. *Id.* Leroy A. declined, choosing instead to "go

7

to PT for 6 more weeks and hope for improvement."[3] *Id.* Dr. Brockmeier instructed him to follow up at that time. R. 338. Leroy A. moved from Virginia to South Carolina shortly after this appointment and did not return to Dr. Brockmeier's clinic during the closed period. *See* R. 442, 477–78.

Leroy A. established care with a new primary-care provider in South Carolina on December 10, 2013. R. 477–79. He reported continued pain and decreased use of his left arm, and a physical examination showed "very restricted" range of motion in that shoulder. R. 478–79. Leroy A. was taking Tramadol for pain, but he was not taking oxycodone (Percocet) at that time. R. 478. He reported exercising for forty-five minutes a day, seven days a week. R. 479. The provider reluctantly renewed Leroy A.'s existing oxycodone prescription and noted that pain management was an option if they could not adequately control his pain at the family medicine clinic. *Id.* Leroy A.'s shoulder was "the same" at a routine follow-up visit in early January 2014. R. 476.

On March 24, 2014, Tom Brown, M.D., reviewed all of these medical records as part of an initial evaluation of Leroy A.'s DIB application. R. 94–103. Dr. Brown opined that he could occasionally lift/carry twenty pounds and frequently lift/carry ten pounds; sit and stand and/or walk for about six hours each during a normal eight-hour workday; occasionally use the left upper extremity to push/pull or reach overhead; and frequently balance and climb ramps/stairs, occasionally stoop, kneel, crouch, and crawl, but never climb ladders, ropes, or scaffolds. R. 101–02. Additionally, he should avoid concentrated exposure to unprotected heights; and he did not have any manipulative limitations. R. 102–03.

Leroy A. also suffered from depression and anxiety after the March 20, 2013 incident. *See, e.g.*, R. 57–62, 359, 376, 519. On March 29, Brian Uthlaut, M.D., prescribed a "short

---
[3] The administrative record filed with this Court does not contain any physical therapy progress notes.

8

course" of lorazepam (Ativan) for Leroy A. to take as needed for panic attacks. R. 376. Four months later, Leroy A. presented to Katherine Jaffee, M.D., for an "acute visit with complaint[s] of increased emotional stress." R. 340. He never took the Ativan that Dr. Uthlaut had prescribed because his medications were "taken away from him when he was incarcerated for slamming his wife's hand in a door, which he sa[id] was an accident." *Id.* Leroy A. exhibited a depressed mood, but he did not appear anxious and his speech was normal. R. 342. Dr. Jaffee diagnosed depression and encouraged Leroy A. to seek care at a community mental-health clinic. *Id.* She also recommended starting an antidepressant medication, but Leroy A. was "not interested in pharmacological therapy." *Id.* On January 9, 2014, Leroy A. told his primary-care provider that he had "concerns with anxiety," which "sometimes" impaired his sleep. R. 476. The provider diagnosed an anxiety disorder and prescribed Lexapro to take once daily and Vistaril to take three times daily as needed for anxiety. R. 476–77. Leroy A. did not report taking either medication during a psychological consultative examination in March 2014, *see* R. 435, and he did not initially mention anxiety or depression as a reason he applied for disability benefits, R. 434–36. *See also* R. 468 ("He states that he is currently waiting to hear from disability due to his torn shoulder/rotator cuff."). When prompted, however, Leroy A. explained that he broke down and cried "3 or 4 times a day" and he had never liked being around large groups of people. R. 436; *see also* R. 468. On April 28, Leroy A.'s primary-care provider referred him to counseling "for depression and anxiety due to a family event." R. 458. He attended an initial session on July 22, R. 468–70, but did not present for scheduled follow-up in September 2014, R. 468.

Leroy A. went to a consultative psychological examination on March 13, 2014. R. 434–36. Gene Sausser, Ph.D., observed that Leroy A. seemed "primarily anxious" and "mildly distant" throughout the interview, but noted that he "was cooperative when answering questions"

9

and "did appear to talk fairly openly." R. 435. Leroy A. did not have any trouble with attention and concentration, but demonstrated "minor memory difficulty, particularly in short-term memory." R. 435–36. His "thought processing was somewhat rambling . . . with loose associations present on several occasions." R. 436. Dr. Sausser opined that Leroy A.'s ability to sustain concentration, persistence, and pace in an ordinary workplace would be "mildly impaired" because of "issues related to anxiety, depression, and sleep" deprivation and that he "could do simple repetitive tasks for short periods of time." *Id.* On September 16, 2014, Timothy Laskis, Ph.D., reviewed all of these medical records as part of a reconsideration-level evaluation of Leroy A.'s DIB application. *See* R. 110–22. Dr. Laskis opined that, although Leroy A.'s diagnosed affective and anxiety disorders caused some "moderate" limitations in his overall mental capacities to perform certain work-related functions, *see* R. 115, 120–22, he nonetheless could "maintain attention and concentration for at least two hour blocks of time throughout a regular work day," "tolerate and work cooperatively with coworkers," consistently perform "simple or routine" tasks, and "attend work regularly." R. 121–22.

IV. Discussion

Leroy A. challenges ALJ Annos's RFC determination, and in particular his finding that Leroy A.'s statements describing disabling left shoulder pain and anxiety were "not entirely credible" when compared to other relevant evidence in the record. R. 29–31; *see* Pl.'s Br. 1. A claimant's RFC represents his "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis" despite his medical impairments. SSR 96-8p, 1996 WL 374184, at *2 (emphasis omitted); *see* 20 C.F.R. § 404.1545. It is a factual finding "made by the Commissioner based on all the relevant evidence in the [claimant's] record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011) (per curiam), and it

must reflect the combined functionally limiting effects of impairments that are supported by the medical evidence or the claimant's credible reports of pain or other symptoms, *see Mascio*, 780 F.3d at 638–40.

The regulations set out a two-step process for ALJs to evaluate a claimant's symptoms. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. § 404.1529; *see also* SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Lewis*, 858 F.3d at 866. Second, assuming the claimant clears the first step, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability," *id.*, to work on a regular and continuing basis, *see Mascio*, 780 F.3d at 639. "The second determination requires the ALJ to assess the credibility of the claimant's statements about symptoms and their functional effects." *Lewis*, 858 F.3d at 866. When conducting this inquiry, the ALJ must consider all the evidence in the record bearing on the claimant's allegations that he is disabled by pain or other symptoms caused by a medical impairment or related treatment. 20 C.F.R. § 404.1529(c). The ALJ also must give specific reasons, supported by "references to the evidence," for the weight assigned to the claimant's statements. *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013) (citing SSR 96-7p, 1996 WL 374186, at *2, *4–5). The ALJ's reasons for discounting a claimant's complaints need only be legally adequate and supported by substantial evidence in the record. *See Mascio*, 780 F.3d at 639; *Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (per curiam) (citing *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)).

More generally, the ALJ's RFC assessment must "include a narrative discussion describing" how medical facts and nonmedical evidence "support[] each conclusion," *Mascio*,

11

780 F.3d at 636, and explaining why he discounted any "obviously probative" evidence, *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977), that supported the individual's claim for disability benefits, *Ezzell v. Berryhill*, 688 F. App'x 199, 200 (4th Cir. 2017). This discussion should "build an accurate and logical bridge from the evidence to [the ALJ's] conclusion," *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)), that the claimant retains a certain ability to sustain work-related activities, *Mascio*, 780 F.3d at 636–37. "In other words, the ALJ must *both* identify evidence that supports his conclusion *and* build an accurate and logical bridge from that evidence to his conclusion" that the claimant is not disabled. *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (internal quotation marks and brackets omitted).

Leroy A. contends that his shoulder pain and anxiety were so continuous and/or severe that he could not work at all during the closed period and that the ALJ should have found him disabled. *See* Pl.'s Br. 1; R. 57–61, 257–63. Neither argument permits reversal or remand under "th[e] deferential review" that I must conduct in this case. *Jarvis v. Berryhill*, 697 F. App'x 251, 252 (4th Cir. 2017) (per curiam); *see also Johnson*, 434 F.3d at 653. The fundamental question before the Court right now is not whether Leroy A. was disabled during the closed period, but whether the ALJ's conclusion that he was "not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." *Craig*, 76 F.3d at 589. ALJ Annos's conclusion satisfies this standard.

* * *

ALJ Annos considered Leroy A.'s medical impairments and related functional limitations throughout his written decision. R. 21–34. At step two, he found that Leroy A.'s shoulder disorders and affective/anxiety disorder were "severe" medical impairments during the closed period because they "more than minimally affected [his] ability to carry out basic[] work-related

12

activities," R. 21, which, according to the regulations, include physical functions like lifting/carrying, reaching, and pushing/pulling, and mental functions like responding appropriately to other people and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b)(1) (2015). At step three, ALJ Annos acknowledged that Leroy A.'s anxiety and resulting symptoms (crying spells, nightmares) caused "moderate difficulties," R. 22, 23, in his overall abilities "to interact independently, appropriately, effectively, and on a sustained basis with other individuals" and "to sustain focused attention and concentration" long enough "to permit the timely and appropriate completion of tasks commonly found in work settings," 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(C)(2)–(3) (2015). *See* R. 22–23, 30–31 (citing R. 99, 103–05, 116, 121–22, 257–63, 435–36). ALJ Annos then set out a reasonably complete and accurate summary of all the record evidence related to Leroy A.'s allegedly disabling medical conditions, including medical progress notes, treatment recommendations, findings on examinations and diagnostic images, medical opinions, and Leroy A.'s statements both to his healthcare providers and at the administrative hearing. *See* R. 21–34.

After considering all of this evidence, ALJ Annos found that Leroy A.'s medical conditions during the closed period did not prevent him from doing "light" work that (among other things) had no "fast-paced production requirements"; involved only "simple, routine, and repetitive tasks" and "simple work-related decisions"; and required at most occasional interaction with the public and coworkers; occasional pushing/pulling and reaching overhead with either arm; and frequent reaching in other directions. R. 24 (punctuation corrected). These functional limitations follow logically from Dr. Brown's and Dr. Laskis's medical opinions of Leroy A.'s physical and mental capacities. R. 101–03, 120–22. ALJ Annos gave their opinions "great weight" because he found that the expert consultants "had an opportunity to objectively

13

review" Leroy A.'s medical records, which related to their respective specialties, and their opinions were "consistent with" the record as a whole, R. 31–32. *See* R. 29–32 (explaining that, overall, the record showed Leroy A. had "significant gaps [in] and limited treatment" for his physical impairments after his June 2013 shoulder surgery, "typically had normal mental signs on exam, his [psychiatric] treatment was largely limited to medications as prescribed by his primary care providers, he did not regularly see mental health specialists, and he was not always compliant in taking his medications"). ALJ Annos also explained that he gave "little weight" to Dr. Sausser's slightly more restrictive opinion of Leroy A.'s mental capacities because he found that the opinion was "not consentient with" Leroy A.'s "typically normal mental signs on exam [and] limited and conservative treatment throughout the closed period." R. 32. Dr. Sausser's opinion that Leroy A. "could only do simple, repetitive tasks for short periods" also seemed at odds with the examining psychologist's own conclusion that Leroy A. "had only mild limitations in maintaining concentration, persistence, and pace," *id. See* 20 C.F.R. § 404.1527(c)(3)–(4). Under this Court's "deferential standard of review, there is enough evidence in the record to support the ALJ's decision to accord" these particular weights to the various medical opinions. *Dunn v. Colvin*, 607 F. App'x 264, 271 (4th Cir. 2015) ("We must defer to the ALJ's assignments of weight unless they are not supported by substantial evidence.").

Finally, ALJ Annos adequately explained why Leroy A.'s allegations that he suffered disabling shoulder pain and anxiety during the closed period, R. 24–25, were "not entirely credible" when compared to other relevant evidence in the record, R. 29–30. *See Bishop*, 583 F. App'x at 68 (affirming ALJ's adverse credibility determination where "the ALJ cited specific contradictory testimony and evidence in analyzing Bishop's credibility and averred that the entire record had been reviewed"). As for his physical pain, ALJ Annos explained that Leroy

A.'s allegations were inconsistent with evidence that he had "significant gaps [in] and limited treatment" for his musculoskeletal impairments for most of the closed period; declined Dr. Brockmeier's recommendation that he have tendon transfer surgery to repair his left shoulder, and instead chose to continue in physical therapy; made inconsistent statements about his physical activities; and worked as a food delivery driver for a few weeks near the end of the closed period before his car gave out on him. R. 29–31. As for Leroy A.'s psychological symptoms, ALJ Annos explained that his allegations were inconsistent with the limited and mild findings on mental status examinations, "his limited and conservative treatment for depression and anxiety that was mainly limited to prescriptions from primary care providers and one counseling visit" during the closed period, his "positive response" to common psychotropic medications, and his admission that he did not take some of these medications every day as prescribed, but rather took them only "'as needed' during the closed period, which he described as about twice weekly." R. 30. These were legitimate reasons for ALJ Annos to question whether Leroy A.'s symptoms really were as severe and functionally limiting as he alleged, *see* 20 C.F.R. §§ 404.1529(c), 404.1571, and all but one were adequately supported by the record.[4]

---

[4] ALJ Annos's factual finding that Leroy A. failed to follow Dr. Brockmeier's surgical recommendation required more explanation before it could provide a legitimate basis to question the intensity, persistence, and functionally limiting effects of Leroy's shoulder pain. *See Nunley v. Barnhart*, 296 F. Supp. 2d 702, 704–05 (W.D. Va. 2003). A claimant who, "without a good reason," fails to "follow treatment prescribed by [a] physician" that could "restore" the claimant's ability to work is legally ineligible for disability benefits. *Dunn*, 607 F. App'x at 275 (quoting 20 C.F.R. § 404.1530); *see Hays*, 907 F.2d at 1457–58 (applying the same principle to "recommended" treatment, including corrective surgery). This so-called "good cause" standard means that an ALJ must *both* give the claimant an opportunity to explain his or her reasons for not submitting to such treatment, *Nunley*, 296 F. Supp. 2d at 704–05, *and* properly consider the claimant's explanation when evaluating his or her statements about symptoms and functional limitations, *Dunn*, 607 F. App'x at 275–76. ALJ Annos did not give Leroy A. an opportunity to explain why he chose to continue physical therapy rather than submit to a second, even more invasive shoulder surgery so soon after the first shoulder surgery had failed. *See generally* R. 46–68. And, unlike with Leroy A.'s explanation that he did not "need" to take his antidepressant medication every day as prescribed, *see* R. 58–59, 435, 475–76, nothing in the record compels the conclusion that Leroy A. did not have a good reason for declining the second shoulder surgery. *Cf.* 20 C.F.R. § 404.1530(c)(3) (explaining that the fact "[s]urgery was previously performed with unsuccessful results and the same surgery is again

At bottom, the ALJ acknowledged that Leroy A.'s complaints of shoulder pain and anxiety appeared throughout the record, and, in his RFC assessment, he accounted for them to a reasonable degree by restricting Leroy A.'s mental and physical work-related activities. This RFC is supported by the opinions of the state agency medical consultants, who had the opportunity to review all of the medical evidence as well as Leroy A.'s statements about his limitations during the relevant closed period. Their medical opinions relate to their areas of specialty, provide reasonable explanations for their conclusions, and are consistent with the record, as ALJ Annos specifically explained. *See Woods*, 888 F.3d at 695 (explaining that the ALJ may credit a non-examining source's medical opinion "where that opinion has sufficient indicia of supportability in the form of a high-quality explanation for the opinion and a significant amount of substantiating evidence . . . ; consistency between the opinion and the record as a whole; and specialization in the subject matter of the opinion"); *Gordon*, 725 F.2d at 235 (noting that the ALJ may rely on a non-examining source's medical opinion "when it is consistent with the record"). Leroy A. understandably disagrees with the Commissioner's decision that his medical conditions were not disabling during the closed period, but he does not identify any specific error in the RFC assessment or point to any piece of evidence not considered by the ALJ that might have changed the outcome of his claim. Pl.'s Br. 1. Having reviewed the record, I am compelled to conclude that the Commissioner's decision is supported by substantial evidence. Accordingly, I must affirm the Commissioner's final decision. *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) (finding no reversible error where the

---

recommended for the same impairment" is itself a "good reason" for the claimant not to undergo the second surgery). Thus, ALJ Annos could not rely on this reason to discount Leroy A.'s complaints of debilitating shoulder pain. The error was harmless, however, because the ALJ's other reasons for finding Leroy A.'s complaints not fully credible were legally adequate and supported by substantial evidence in the record. *See Kersey v. Astrue*, 614 F. Supp. 2d 679, 696 (W.D. Va. 2009) ("Errors are harmless in social security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error.").

ALJ's factual findings related to the relevant time were "amply supported by the record" and the claimant "failed to point to *any* specific piece of evidence not considered by the Commissioner that might have changed the outcome of his disability claim").

V. Conclusion

For the foregoing reasons, I find that substantial evidence in the record supports the Commissioner's final decision that Leroy A. was not disabled before March 31, 2014. Accordingly, the Court will **GRANT** the Commissioner's motion for summary judgment, ECF No.16, **AFFIRM** the Commissioner's final decision, and **DISMISS** this case from the Court's active docket. A separate order will enter.

The Clerk shall send certified copies of this Memorandum Opinion to the parties.

ENTER: September 26, 2018

Joel C. Hoppe
United States Magistrate Judge